Jeffrey Alan KUMSHER, Appellant,

v.

Heidi Lynn KUMSHER, Respondent.

No. WD 40432.

Missouri Court of Appeals,
Western District.

Dec. 6, 1988.

Rehearing Denied Jan. 31, 1989.

Barton S. Blond, Kansas City, for appellant.

Bonnie E. Marriott and Roger M. Driskill, Richmond, for respondent.

Before FENNER, P.J., and MANFORD and GAITAN, JJ.

MANFORD, Judge.

Jeffrey Alan Kumsher (appellant) appeals the Order rendered on January 7, 1988 in the Circuit Court of Jackson County, Missouri denying his Motion to Modify the Decree of Dissolution of Marriage as to Child Custody.

The marriage of appellant and Heidi Lynn Kumsher (respondent) was dissolved in the Circuit Court of Jackson County, Missouri on September 5, 1986. Pursuant to the Decree of Dissolution, respondent was awarded the care, custody and control of the parties' minor daughter, Misti Marie Kumsher, born January 14, 1984. The following evidence was introduced at the hearing on appellant's Motion to Modify Child Custody.

Since the time of the prior decree, respondent has moved the child to several residences and had at least four temporary "visits" with various friends during which she and the child lived with the friends. In May of 1987, respondent and Todd Miller, her fiancé at the time of the hearing, moved to Stoneybrook Apartments in Raytown, Missouri.

At the time of the hearing, respondent had no telephone at the apartment. She stated that she wanted it to be difficult for appellant to communicate with her and that she was not depriving appellant of an ability to contact his daughter. Rather, she said, she was "just saving herself a lot of hassle."

The parties entered into a written agreement regarding temporary custody of their daughter on March 27, 1987. Pursuant to the agreement, respondent transferred temporary custody of the child to appellant until respondent became financially and physically able to care for the child. At the

end of May, 1987, respondent regained custody of the child.

Respondent held a variety of jobs in the period between the dissolution in September, 1985 and the hearing in December, 1987. For many of these jobs, she remained employed for only a matter of weeks. In August of 1987, respondent began work for Burger King. She anticipated becoming a manager of a newly constructed Burger King in Overland Park, Kansas soon after the hearing date. In addition to employment at Burger King, respondent worked for the manager of the Stoneybrook Apartments where she resided.

Vivian Fox, a mutual friend of the parties, testified that respondent was unhappy with the custody proceedings and that respondent said that she (respondent) was going to kill appellant and anyone else who had anything to do with it. However, respondent denied ever talking to Fox about any such threats.

Fox testified that she had visited respondent at the Stoneybrook Apartments on three occasions. Fox saw food left on tables, clothes on the floor, a dirty bathroom, beer cans on the coffee table and "roaches[1], dope in the ashtrays." Fox also testified that during a discussion regarding the discipline of the child, respondent said Todd would hang the child from the shower curtain. Fox related hearing Todd say to the child that she (the child) had better behave or he would take her into the bathroom. The child responded by running over to Fox and calling her by name.

The Children's Hot Line of the Missouri Division of Family Services received a referral on October 15 alleging physical neglect and/or abuse of Misti Kumsher. The caller[2] confidentially reported that six adults lived in a two bedroom apartment, the child was being inappropriately punished, she smelled, the house was dirty and beer cans and drug paraphernalia were scattered about, the child was wearing only summer clothes during October, and the child slept with respondent and her boyfriend. Cindy Lozon, on behalf of the Missouri Division of Family Services, talked with the person(s) reporting these incidents. Lozon telephoned respondent and arranged to meet at respondent's apartment about one hour later. Lozon stated that during her visit at the apartment, she did not see beer cans or drug paraphernalia, a dirty child or a dirty home. She did not find signs of abuse of the child. Lozon concluded that the child was bright, articulate, very knowledgeable and seemed as if she was receiving love and care.

At the time of the hearing, appellant had lived at the same address in Oak Grove, Missouri for fourteen months. Shelly Cansler, his fiancé, lived with appellant. He was employed by Blue Beacon Truck Wash for over eight years and anticipated being transferred to Pennsylvania. In eight years of employment with that company, appellant has moved four times.

Appellant testified that at times the child had medical problems which needed attention. Once appellant picked up the child for a visit and discovered sores on her body. Appellant took the child to a doctor who prescribed medication for impetigo. On another occasion, the child had sores on the back of her pierced ears. Appellant obtained pills from the doctor for this condition. Appellant also took the child to a doctor to be treated for pin worms. The respondent said she did not have time to take the child to a doctor.

The child's general appearance, appellant testified, was not always good. He said that each time he received the child, he would immediately bathe her because she was dirty and at times smelled. Additionally, the child's clothing had not been proper for the weather and was too small for her.

Appellant stated that respondent had threatened the safety of the child, himself

---

**1.** Fox clarified that the term "roaches" was commonly used to refer to marijuana cigarettes.

**2.** The caller was later identified as Shelly Cansler, appellant's fiancé. Cansler testified that she learned of some of the conditions of the apartment and child from conversations with Fox.

and his girlfriend. He testified that respondent told him to remember the recently publicized case of a mother who lost a custody dispute and subsequently killed the children. Appellant said he was told by respondent that if she could not have the child, nobody would. Cansler also testified to threats made by respondent against her.

Respondent telephoned Fox after the Labor Day weekend of 1987 and related the events which transpired at an A.B.A.T. motorcycle convention[3] which respondent attended over the weekend. Respondent went to Fox's house that same day and again discussed the events of the weekend. Fox set up an audio tape recorder and recorded respondent's description of the weekend trip.[4] The voices of Fox, respondent, Todd Miller and another man are recorded in the tape. Respondent was not aware that her voice was being recorded. Fox stated that it was at the suggestion of appellant's fiancé that she made the tape in an effort to help the child. It was made clear during the hearing that the child was visiting the appellant over the Labor Day weekend when respondent attended the motorcycle convention.

From the audio tape, which was received into evidence, the following facts are established: Respondent and several companions attended an A.B.A.T. motorcycle convention at Prairie Lake over the Labor Day weekend of 1987. She spent three days and two nights at the site. Thousands of people attended the convention, which took place in various campgrounds. Alcohol and drugs were present. Respondent narrated how she was "plastered" at the convention. Before even arriving, she tells, "I was so drunk, I drunk a pint of Jack Daniels on the way over to Prairie." She admits that she and her companions "took a hit of acid before arriving", adding "that was the first time I ever tripped in the daytime." Respondent explained to Fox how people put heroin directly into their eyes and the resulting effects on the brain.

She described how people "ran around naked" at a wet t-shirt contest, including herself. She stated that she bared her breasts when requested by men to do so. Whenever Todd turned his back, said respondent, another male companion would approach her, kiss her and talk with her. In respondent's opinion, she and Todd were "the only civilized people" there because all the others were "hardcore Harley bikers." Respondent had previously attended a similar motorcycle convention in St. Louis. Finally, respondent encouraged Fox to accompany her and others to the next annual A.B.A.T. motorcycle convention.

At the close of the hearing, the matter was taken under advisement. There was no formal request for findings of fact or conclusions of law. On January 7, 1988, the trial court rendered its order denying appellant's motion to modify the child custody. Consequently, respondent maintained custody of the child. This appeal followed. The judgment is reversed and the cause remanded with instructions.

■ Appellate review of this case is governed by the well-known and oft repeated precepts of Rule 73.01 V.A.M.R. and *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The trial court's judgment ordering that custody of the child remain with respondent may be reversed on appeal only if the judgment is not supported by substantial evidence, is against the weight of the evidence, or results from an erroneous declaration or application of the law. Appellate courts are admonished to exercise the power to set aside a decree or judgment on the ground that it is against the weight of the evidence with caution and with a firm belief that the decree or judgment is wrong. *LSS v. PAS*, 700 S.W.2d 517 (Mo. App.1985). This court has that firm belief in the error and wrongfulness of the judgment in this case.

■ Appellant's first point on appeal urges this court to consider the contents of

---

**3.** Respondent testified that A.B.A.T. stood for American Bikers Against Terrorists, and at the outdoor convention a large group of bikers get together from all over the country for charity causes and to protest helmet laws.

**4.** The audio tape was received into evidence at the hearing.

the audio tape made by Fox in reviewing the denial of the motion for modification of child custody. Respondent, on the other hand, argues that this court of appeals is prohibited from acting as a trier of fact and reviewing new evidence which was not available to the trial court. Respondent is simply wrong in the argument that the audio tape was not preserved for review because it was not admitted into evidence by the trial court. The hearing transcript indicates that after a proper foundation was laid and the objections as to relevancy and materiality were overruled, the tape was played for the court. After several minutes of play, the following exchange took place:

THE COURT: But this way, now, I can't understand anything, so there's no use running this tape. I'll let you introduce it as part of the record for whatever purpose it may serve you, but I cannot understand it.

(Counsel for Appellant): Well, I apologize to the court; I did not realize it was not that easily understood, because I had listened to it. Maybe I had the volume turned up too loud, or something was distorting it. I could do that by turning it down.

THE COURT: I couldn't understand anything.

(Counsel for Appellant): Well, I turned it up trying to make sure that everybody could hear it and it may have distorted the—distorted it in some regards.

THE COURT: I understand. I'll just receive it as part of the record.

The audio tape, although not played in its entirety during the course of the hearing, was properly introduced into evidence and made part of the record. In light of the clear statements by the Court that the tape was admitted into evidence, the respondent's argument that the tape did not become evidence because it was not marked as an exhibit must fail. In reaching a determination, this court has analyzed the record as a whole, including the audio tape which has been presented as an exhibit on appeal.

■■■ Appellant's second point on appeal contends that the trial court erred in denying the motion to modify child custody because the order is against the weight of the evidence. In considering this assignment of error, this court notes the standard applicable to modifications of child custody. A trial court shall not modify a prior custody decree unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child. § 452.410, RSMo 1986. The moving party has the burden of showing a change in circumstances which has occurred since the original award of custody sufficient to justify a transfer of custody. *Ryan v. Ryan*, 652 S.W.2d at 315. The trial court erred in concluding that in this case the appellant, the father, had not met this burden in showing changed circumstances of the custodial parent warranted a modification to serve the best interests of the young daughter.

■■■ In determining whether to modify custody of a child, it is permissible to consider the morals and mode of life of the parties. *H v. H*, 637 S.W.2d 432, 434 (Mo. App.1982). Grossly immoral conduct on the part of the child's custodian justifies denying custody to that parent. *In re Marriage of P.I.M.*, 665 S.W.2d 670, 672 (Mo.App.1984). A change in the moral fitness of the custodial parent is a vital factor in determining whether custody should be changed to the noncustodial parent, and it is not necessary to wait for manifestation of harmful consequences before action is taken. *Ryan v. Ryan*, 652 S.W.2d 313, 315 (Mo.App.1983).

■■■ The weight of the evidence in this case reveals that the mother's conduct and moral fitness are grossly deficient from those required of a custodian of a young girl of impressionable years. A verbatim recital of the evidence is not necessary. In sum, the record contains evidence of respondent's admitted use of controlled substances, as well as accusations by other

witnesses of drug paraphernalia openly scattered in her apartment. Respondent possessed a sophisticated knowledge of the use of controlled substances. This court acknowledges that there is no specific evidence that respondent consumed controlled substances in the presence of the child. However, given the classification of substances being used, including what would be considered hard drugs such as acid, there is a great concern that use of such substances will affect the behavior and mental well-being of the mother while she is caring for the child. Use of these controlled substances, even outside the presence of the child, can have a carryover effect on conduct when the user is present with the child. There was also evidence that respondent had been sexually promiscuous, and she shared an apartment and bedroom with a man who was not her husband. In addition, there were indications that the improper conduct of respondent was likely to continue in the future. Finally, this court notes that the trial court concluded the hearing with an openly harsh criticism of respondent's fitness as a parent.

As was so aptly stated in *L.H.Y. v. J.M.Y.*, 535 S.W.2d 304, 308 (Mo.App.1976), "[the courts] do not pass judgment on private morality in the absence of some societal interest. That is left to others. Our concern here is the best interest of the child. That is the polestar we are duty bound to follow." Under the particular facts and circumstances of this case, this court concludes that the trial court erred in denying modification of child custody. The weight of the evidence shows that a change has occurred in the circumstances of the custodian since the prior decree and that the modification is necessary to serve the best interests of the child.

By way of a third point on appeal, appellant contends that the trial court erroneously declared and applied the law regarding the modification of a custody decree. This point need not be addressed in light of the determination under point two, *supra*, that the trial court's judgment is reversed on the grounds that it is against the weight of the evidence.

The judgment is reversed and the cause remanded to the trial court with directions to enter an order awarding the custody of Misti Marie Kumsher to Jeffrey Alan Kumsher. This court is aware that Jeffrey Alan Kumsher had intended to relocate to another state and reside there shortly after the hearing. Both parties and the trial court were advised of this at the time of the hearing and the award of child support and visitation provisions were drafted accordingly in the trial court's order of January 7, 1988. On remand, the trial court is instructed to similarly fashion awards of child support and visitation as it deems appropriate under the circumstances.

Finally, respondent asserts that no points have been preserved for review because appellant's brief violates Rule 84.04 V.A.M.R. and the instructions in *Thummel v. King*, 570 S.W.2d 679 (Mo. banc 1978). Respondent's assertion is without merit. Although broken down into subparts, the points relied on sufficiently state which rulings of the trial court are sought to be reviewed and why they are claimed to be erroneous.

The judgment is reversed and remanded.

FENNER, P.J. concurs.

GAITAN, J., dissents in separate dissenting opinion.

GAITAN, Judge, dissenting.

I respectfully disagree with the decision of the majority to assume the role of the trier of facts. While I agree that had I been the trier of fact, I might have decided this case differently. We, however, as the reviewing court, are obligated to give deference to the trial court's judgment where it is supported by the record. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), Rule 73.01.

Unfortunately, custody matters often become an embittered and emotional struggle between the parents and their respective allies to try and convince the trial judge that one is more unfit as a parent than the other. Appellant (father) argues that respondent (mother) has violated his visita-

tion rights by making it difficult for him to contact his child. Respondent counters by alleging that appellant has taken the child out of state during visitation and would not return her as provided for in the decree. Additionally, there are allegations of illicit sex and drug use on the part of respondent. This assertion is allegedly corroborated by a tape recording made by Vivian Fox. Ms. Fox, whom respondent stated was an ex-lover of appellant, was solicited to make this recording by Shelly Cansler, appellant's then girlfriend.

Regarding the motorcycle convention, respondent states she did not know that she was going to a convention. Instead, she thought that she and her boyfriend were going to the lake for the weekend. The appellant and his witnesses would have the court believe otherwise. They allege that respondent is sexually permissive and that she is a substance abuser of some standing. Respondent denies these charges. Notwithstanding any statement to the contrary, the majority opinion turns on those statements attributable to respondent in the transcribed version of the taped conversation submitted by Vivian Fox. A transcription that the trial court did not have. The trial judge concluded on the record after listening to the tape for approximately four to five minutes that he did not understand it and would have preferred a transcript so he could attempt to follow it. Nonetheless, the trial judge received the tape into evidence stating to appellant that he would let appellant introduce the tape as part of the record "for whatever purpose it may serve you."

The majority assumes this taped evidence was completely ignored by the trial court. As a consequence, the majority feels it may take that evidence and conclude that it is the piece of the puzzle which, had the trial court considered, would have proven respondent's unfitness as a mother to be the custodial parent. The record reflects that the trial judge listened to the tape for four or five minutes. It is readily apparent from the transcription of the tape that respondent's conduct which is complained of is described within the first five to six pages. Surely, that much of the evidence the trial judge heard, although he may not have been able to readily identify who the parties were as they spoke. However, given the subsequent testimony of Vivian Fox and others the trial judge knew by the conclusion of trial that respondent was allegedly the one who stated she used controlled substance. It is clear from what is alleged to be a written transcript of the tape that respondent engaged in less than model behavior for a parent. However, a great deal of the conduct discussed was that of others and not respondent. I certainly do not condone her conduct nor the others at this convention. The trial judge indicated his displeasure by stating "She's not my idea of anybody that I would want to be my mother, that's for sure."

The trial judge concluded after taking the matter under advisement and weighing the totality of the evidence, and judging the credibility of the witnesses that a substantial change in circumstances had not occurred; that the best interest of the child was not a risk. This trial judge is not unfamiliar with these types of proceedings. Rather, he is a seasoned veteran of the judiciary. He set aside any personal biases and acted on the credible evidence as he was charged.

When you have a cast of players such as existed in this proceeding with their respective biases, we *must* defer to the judgment of the one neutral party, the trial judge, who was there to look these people in the eye and determine their believability. He is free to believe or disbelieve these witnesses. *See Sur–Gro Finance, Inc. v. Smith,* 755 S.W.2d 439 (Mo.App.1988). Our review of the transcript does not provide the same opportunity.

I, too, believe that there may be considerable room for improvement on the part of the respondent relative to her role as a parent. However, Cindy Lozon, a social worker with the Division of Family Services who investigated a hot line neglect charge against respondent found the charge to be unfounded and the child to be well cared for. Her testimony would seem to vindicate the judgment of the trial court.

Ms. Lozon had no ax to grind. She believed the child to be healthy and normal.

Again, I believe the judgment of the trial court should be given more deference here. If there is doubt as to whether or not the trial court took into consideration the testimony on the tape, the case should be remanded to the court to either (1) state what weight, if any, it gave that evidence or (2) if the tape was not considered to order the court to consider a written transcription of the tape.